FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 3 0 2011

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br>cx rel. YVETTE ODUMOSU, **and**<br>**STATE OF GEORGIA**<br>cx rel. YVETTE ODUMOSU<br>**Plaintiff, Relator** | )<br>)<br>)<br>)<br>)<br>) **1:11 - CV - 1007**<br>) CIVIL ACTION NO. _____<br>) **Jury Trial Demanded**<br>) |
| **v.** | ) **FILED UNDER SEAL AND**<br>) **IN CAMERA** |
| **PEDIATRIC SERVICES OF AMERICA HEALTHCARE**<br>**Defendant** | )<br>) |

**AT**

## COMPLAINT

The United States of America and the State of Georgia, by and through Relator, Yvette

Odumosu, R.N. (Odumosu), bring this action under 31 U.S.C. § § 3729-3732 ("False Claims

Act") and O.C.G.A. § 49-4-168.1 *et seq.* (State False Medicaid Claims Act") to recover

damages, penalties, and other remedies established by the False Claims Act on behalf of the

United States and herself, and the State False Medicaid Claims Act on behalf of the State of

Georgia and herself and would show the following:

JURISDICTION AND VENUE

1. This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq*, and the Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168.1 *et seq*.

2. This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1345.

3. This court has personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) in that Defendants do transact business in this jurisdiction and portions of the violations of the False Claims Act and the State False Medicaid Claims Act described herein were carried out in this district.

4. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a).

## THE PARTIES

5. Defendant, Pediatric Services of America, is a privately held corporation organized under the laws of the State of Georgia, with its principal place of business in the County of Gwinnett within the jurisdiction of this court.

6. Pediatric Services of America has contracted with the State of Georgia to operate as a home healthcare service provider for medically fragile children and adults.

7. PSA offers pediatric private duty nursing, pediatric day treatment, coordinated care management, pediatric and neonatal nursing care, and adult private duty nursing services.

8. PSA is paid through various insurance programs, including, publicly funded programs such as Medicaid, Medicare, Georgia Pediatric Program (hereinafter GAPP) and other federal and state-funded health-care programs.

Filed 03/30/11

9. The aforementioned publicly funded programs impose on PSA various obligations with respect to charges for services, and qualifications of individual patients to receive the public benefits with respect to PSA's services.

10. Relator is an individual citizen of the State of Georgia, residing in the Fulton County, within the jurisdiction of this court.

11. Since March 8, 2010, and continuing through the present, Relator, has been employed by PSA as the Director of Clinical Nursing at its Norcross facility.

## THE MEDICAID PROGRAM

12. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. The Centers for Medicare and Medicaid Services ("CMS") administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administration and operational procedures.

13. At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies

Filed 03/30/11

and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

14. 42 C.P.R § 455 *et seq.*, expressly states that a provider must certify that it is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid.

15. The Georgia Department of Community Health's "Policies and Procedures for Medicaid/PeachCare for Kids" (hereinafter "Medicaid Policies and Procedures") requires that , as a general condition of participation , all enrolled providers "[c]omply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services. *Id* at 106(B).

16. The Medicaid Policies and Procedures mandate that enrolled providers "[n]either bill the Division for any services not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered." *Id* at 106(J).

17. The Medicaid Policies and Procedures also state that enrolled providers must "[a]ccept responsibility for every claim submitted to the Division that bears the providers name or Medicaid/PeachCare for Kids provider number. Submission of a claim by a provider or his agent, acceptance of a Remittance Advice, or acceptance of claim payment constitutes

Filed 03/30/11

verification that the services were performed by that provider (or under his direct supervision, if allowed by the Division) and that the provider authorized submission of the claim for reimbursement...Payments shall be deemed accepted when cashed, negotiated, or deposited, including those payments deposited electronically. *Id* at 106(L)

18. The Medicaid Policies and Procedures define "overpayment" to include a payment to a provider that is "for a service not actually rendered by the provider" or "rendered by a provider who failed to comply with all conditions of participation related to the service(s) for which a claim was paid" or "for a service that does not comply with all requirements, terms and conditions for reimbursement detailed in the Divisions' Policies and Procedures manuals." *Id*. At Definitions, 30(d),(f),(j).

19. The Medicaid Policies and Procedures require enrolled providers to [r]efund any overpayments or Advance Payments to the Division within required time frames." *Id* at 106(M).

20. According to the Medicaid Policies and Procedures "[w]hen a provider believes a negative adjustment is appropriate, the provider may adjust and resubmit a claim... This will result in deduction from future reimbursement. A provider may also mail a check for the appropriate amount..." *Id* at 205(B).

21. The Department of Community Health encourages providers to self-audit in an effort to identify claims errors and overpayments. Should an overpayment be discovered by the provider, it "must alert the Department and work toward a resolution or refund." *Id* at 402.10 (emphasis added).

Filed 03/30/11

22. Moreover, the provider must send the Program Integrity Unit (PIU) with the Office of
Inspector General a self disclosure letter detailing the potential overpayments, and that
includes a "Corrective Action Plan" describing actions that have been taken to correct the
cause of the overpayment and steps that will be taken to prevent overpayments in the
future. *Id.*

23. The Georgia Department of Community Health's Part II "Policies and Procedures for The
Georgia Pediatric Program (GAPP)" (hereinafter "Medicaid GAPP Policies and
Procedures") requires that, as a general condition of participation , all enrolled providers
"[m]ust comply with Part I and Part II of the Policies and Procedures Manual for Georgia
Pediatric Program (GAPP) with all applicable federal, state and local laws, rules, and
regulations. *Id* at 602(B).

24. Medicaid GAPP Policies and Procedures requires that all enrolled service providers must
"Provide all services in accordance with a current plan of care ordered and authorized in
writing by the member's attending physician and the GMCF Medical Review Team;" *Id.*
At 602.3D(A)(2).

25. Medicaid GAPP Policies and Procedures require that all enrolled service providers must
"When records are accidentally destroyed, the responsible party must reconstruct them to
the extent possible in a timely manner. Each reconstructed case record must be clearly
labeled "reconstructed". *Id* at 602.5(2)

Filed 03/30/11

26. Medicaid GAPP Policies and Procedures requires that "A reevaluation of eligibility (level of care) must be done, at a minimum of every three months by the GMCF Medical Review Team for in home members and six (6) months for Medically Fragile daycare for the Department to continue reimbursement of services beyond the initial approval date." *Id. at* Ch703.2.

27. Medicaid GAPP Policies and Procedures requires that a "Provider shall report member's skilled nursing needs both accurately and truthfully when making original application for the GAPP program as well as on any application for recertification of hours needed for skilled nursing. Derivation from this requirement may result in Adverse Action (see Section 603)." *Id. at* Ch 604(B).

28. Medicaid GAPP Policies and Procedures requires that The DMA-6 A must be submitted to GMCF within thirty (30) days from the date of physician's signature. The DMA-6 A is valid for a limited time, not to exceed 1 year from the date of the GMCF approval. To remain valid, in home or medical day care services must be initiated within the sixty (60) day time frame from the approval of the DMA-6 A. The original, approved DMA-6 A must be submitted to the GMCF Medical Review Unit when sent via mail. *Id. at* Ch801.2A

29. According to the Medicaid GAPP Policies and Procedures, "It is the responsibility of the Nursing Agency to obtain and return to GMCF-Medical Review Team all required signatures prior to or before the 30 calendar day deadline after receipt of the Determination Letter of Approval. The Nursing Agency must retain a copy of all original signatures in case of DCH audit. d) The Nursing Agency must return to GMCF signatures Filed 03/30/11

as they obtain them. The Determination Letter of Approval – signature page should not be held to obtain all three signatures at once.  Again, the GAPP provider has the responsibility to comply with the GAPP Policies and Procedures and meet all requirements WITHIN the 30 calendar day timeframe. (The 30 days includes all days)....l) Failure to comply with returning all signatures on the Determination Letter of Approval to GMCF within the 30 calendar day time period will subject a GAPP provider to review and recoupment by the DCH's Program Integrity Unit. *Id* at Ch 803(a-d).

30. Medicaid GAPP Policies and Procedures also state, "Skilled nursing care services will be reduced when the medical condition of the member stabilizes to give more of the responsibility of the care of the member to the parent(s) and or caregiver(s). One of the goals of the Georgia Pediatric Program is to teach the parents and caregivers how to care for the member in the absence of a nurse.  The Georgia Pediatric Program is not intended to be a permanent solution to skilled care. It is a teaching program." *Id* at Ch803.A c).

31. According to Medicaid GAPP Policies and Procedures, "Nurses caring for children on the Georgia Pediatric Program must have a current background in pediatric nursing and experience within the past two years...I. Services Which May Be Provided by A Registered Nurse Include:... i) Supervision and teaching other nursing personnel (supervisory visits must be performed by the R.N. at least monthly and documented in the clinical record); II. Service Which May Be Provided By A Licensed Practical Nurse Include:...d) When an L.P.N. is utilized in the plan of care, an R.N. must make a monthly supervisory visit to the member's residence to monitor the delivery of services and to determine whether treatment goals are being met; this may include observation of the

Filed 03/30/11

L.P.N. Visits made to evaluate, supervise or instruct the L.P.N. are considered administrative costs and are not reimbursable. The supervisory visit must be documented and dated in the clinical record." *Id* at Ch901.

32. Medicaid GAPP Policies and Procedures, "Nurses caring for children on the Georgia Pediatric Program must have a current background in pediatric nursing and experience within the past two years." *Id* at Ch901.

33. Medicaid GAPP Policies and Procedures states that "The nursing agency must establish and maintain at the agency's office a current clinical record on all patients admitted to the agency. d) Signed and dated progress notes written the day the service is rendered by the providing member of the health team; e) Current medical plan of treatment signed and dated by the attending physician every sixty (60) days;;.. h) Copies of summary reports sent to the physician at least every sixty (60) days; j) Provider care plan signed and dated at least every sixty (60) days; l) Monthly supervisory notes dated and signed by the R.N. when applicable; All original forms and signed documents (DMA-6A and Letter of Approval with signatures, etc.) will now be kept in the nursing agency's file for audit and /or inspection purposes. Legible copies and copies of complete pages of original documents must be mailed (NOT FAXED) to GMCF's Medical Review Team for review with the complete application packets;" *Id* at Ch904.

34. "The clinical record must include progress notes written after each visit or contact with the patient. These written notes should include all information pertaining to the patient.

Filed 03/30/11

~ 9 ~

Any problems reported by a patient or family must be addressed in these notes." *Id* at Ch904.3.

35. Medicaid GAPP Policies and Procedures define Non-Covered Services as "c) Services provided in a manner inconsistent with the provisions of this manual. h) Services rendered out of compliance with the terms and conditions of the provider's statement of participation and the provisions of this manual." *Id* at Ch905.

## FRAUDULENT SCHEMES

36. PSA had numerous compliance issues that resulted in overbilling to the State.

37. For example, Plans of Treatment (POT or 485) were supposed to be reviewed every 60 days by PSA and the physician assigned to the case.

38. Cristy Carey, Location Director, instructed an administrative assistant to tell a doctor "Not to date the POTs or 485, K-5 and L-2's, we will fill it in later."

39. PSA is in violation of Medicaid GAPP Policies and Procedures Ch 803(d) as a result of the above practice.

40. One major outcome of the review is that the physician determines if the patient needs continued services from PSA and how much services are still needed.

41. The physician has to re-certify that services are needed every 60 days.

Filed 03/30/11

42. Physician signatures must be obtained within 30 days as per state regulations from the beginning of the certification or re- certification period. Medicaid GAPP Policies and Procedures *Id* at Ch.803(d).

43. If the patient is under the GAPP waiver program at the end of each authorization period, which could be between 3 to 6 months, a new GAPP packet has to be reviewed and signed by the parents and the physician of the patient. Based upon the information contained in the GAPP packet, GAPP agrees to continue paying for the patient to receive the services.

44. The failure to secure the proper signatures in the time required by GAPP will subject a GAPP provider to review and recoupment by the DCH's Program Integrity Unit.

45. Before April *2010,* PSA, by and through its managerial employees, conceived, implemented and directed PSA employees plans and practices by which employees were paid for a full shift although said employees did not work a full shift.

46. These practices include, but are not limited to, employees receiving payment for an 8 hour shift for an actual 5 hours service.

47. Parents are asked by PSA employees to sign blank GAPP forms to be used by PSA at a later date.

48. The nurse later uses one of these blank forms, and parents are thus unable to determine the actual number of service hours for any given date or period.

49. PSA conceived and implemented plans and practices of improperly inflating bills for services in cases where the services were not needed at all or likely to be reduced.

Filed 03/30/11

50. On September 8, 2010, PSA corporate officer, Marc O'Gwynn, was informed by the Relator that there were numerous instances of erroneous billing practices occurring at PSA.

51. O'Gwynn responded, "We should probably reach out to Beth Rubio (*Defendant's Vice President and Chief Nursing Officer)* to get her opinion.

52. On or about September 8 *2010,* Relator complained in writing to Beth Rubio, whose PSA duties include her being in charge of "corporate compliance" about the PSA plan and practice of " altering the GAPP documentation " in order to collect additional money.

53. These erroneous and duplicative billing practices continued after the September 8, 2010 email complaint by Relator.

54. The above-mentioned practices include, but are not limited to; photo copying of parental/guardian and physicians signatures on documents which are then resubmitted to GAPP (Medicaid) for reimbursement.

55. The result of said PSA practices were multiple reimbursements, without the parent/guardian or physician's verification/authorization during each of the periods reported to Medicaid.

56. Specifically when client Parents sign GAPP documentation for one certification period and that same paper work is altered and photo copied and later resubmitted for an alternate certification period for Medicaid reimbursement.

Filed 03/30/11

57. These PSA practices had the direct, natural effect of enabling PSA to obtain Medicaid funds to which it was not entitled.

58. Relator at various times between April 2010 through the present, made complaints about these and other wrongful and/or wasteful practices to PSA Location Director Cristy Carey, and Beth Rubio.

59. Relator has direct, independent, and firsthand knowledge of PSA agents, officers and employees mass photo copying of signatures on documents which are then resubmitted to GAPP (Medicaid) for reimbursement. This results in multiple reimbursements without allowing the parent to verify that services were actually received, either fully or partially, during each of the periods reported to Medicaid, in violation of the False Claims Act U.S.C. 31 § 3729(a)(1)(A) and State Medicaid False Claims Act O.C.G.A. § 49-4-168.1 *et seq.*

60. Relator has direct, independent, and firsthand knowledge of PSA agents, officers, and employees, changing dates through the process of whiting out, photo copying, and submission to Medicaid for reimbursement, in violation of the False Claims Act and State Medicaid False Claims Act, False Claims Act U.S.C. 31 § 3729(a)(1)(A) and State Medicaid False Claims Act O.C.G.A. § 49-4-168.1 *et seq.*

61. Relator has direct, independent, and firsthand knowledge of PSA agents, officers, and employees, falsifying documentation in patient charts in violation of the False Claims Act and State Medicaid False Claims Act. False Claims Act U.S.C. 31 § 3729(a)(1)(A) and State Medicaid False Claims Act O.C.G.A. s 49-4-168.1 *et seq.*

Filed 03/30/11

62. GAPP is an educational program designed to teach the primary and secondary caregiver how to perform the duties incident to the care of the pediatric patient. Medicaid GAPP Policies and Procedures, *Id* at Ch 803.Ac.

63. Pursuant to the above Medicaid mandated educational requirement, the provider, PSA, is to complete a checklist indicating the caregiver's progress towards the goal of competency.

64. Cristy Carey, Norcross Location Director, instructed the Norcross PSA coordinators as follows, "Don't put a 'C' "for competency on all areas of the PSA checklist because PSA service hours will be reduced if the primary or secondary caregiver is capable of administering the services themselves."

65. The Medicaid Policies and Procedures mandates that providers shall not "bill the Division for any services not performed or delivered in accordance with all applicable policies, or submit inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered." *Id* at 106(J).

66. PSA nurse, Jane Doe 1, worked only a partial shift then forged the parent's name on her timesheet indicating she worked a full shift.

67. The parent, Parent 1, stated that "Jane Doe 1 often works less than a full shift with her child but reports that she worked a full shift to Medicaid."

68. Home Skilled Nursing Services for Medically Fragile Day Care requires that nurses caring for children under GAPP have a current background in pediatric nursing and experience within the past two years. The GAPP Medicaid Policies and Procedures *Id* at Ch.901.

Filed 03/30/11

69. PSA hires nurses without the requisite pediatric experience and/or knowledge and experience with pediatric specific equipment.

70. In one instance, a nurse's lack of experience with pediatric ventilator equipment caused her pediatric patient to be transported to the Emergency Room. The nurse was only familiar with adult ventilator equipment.

## RETALIATION

71. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

72. The more Relator complained about the improper duplication of physicians and parents signatures to the site manager Cristy Carey, the more tension was created between her and her supervisors.

73. Relator was in charge of visiting registered nurses (clinical coordinators), when she complained that said clinical coordinators were not completing reports while in the home of the patients tension was created between Relator and other agents, officers and employees of PSA.

74. The tension between Relator and her supervisors hit its peak on October 22, 2010, when she was given the option to resign, or be placed on a "Performance Plan" (PIP). PIP is punitive in nature.

75. On December 16, 2010, the Relator was placed on administrative leave by Cristy Carey. Said leave constructively discharged the Relator in violation of 31 U.S.C. § 3730(b).

Filed 03/30/11

## COUNT I
## Violation of 31 U.S.C. § 3729- False Claims Act

76. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

77. As set forth above, PSA by and through its agents, officers and employees, knowingly presented, or caused to be presented to the United States Government numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act U.S.C. 31 § 3729(a)(1)(A).

78. As set forth above, PSA by and through its agents, officers and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act U.S.C. 31 § 3729(a)(1)(B).

79. As set forth above, PSA by and through its agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(G).

80. Due to PSA's conduct, the Government has suffered substantial monetary damages.

81. The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of PSA's violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, an amount that will be proven at trial.

Filed 03/30/11

82. The United States is entitled to a civil penalty of between $5,500 and $ 11,000 as required by 31 U.S.C. § 3729(a) for each of PSA's fraudulent claims.

83. Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II
## Violation of O.C.G.A. § 49-4-168.1 – State Medicaid Claims Act

84. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

85. As set forth above, PSA by and through its agents, officers and employees, knowingly presented, or caused to be presented to the Georgia Medicaid program numerous false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

86. As set forth above, PSA by and through its agents, officers and employees, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid by or approved by the Georgia Medicaid program, in violation of O.C.G.A. § 49-4-168.1(a)(2).

87. As set forth above, PSA by and through its agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Georgia, in violation of O.C.G.A. § 49-4-168.1(a)(7).

88. Due to PSA's conduct, the State of Georgia has suffered substantial monetary damages.

Filed 03/30/11

89. The State of Georgia is entitled to treble damages based upon the amount of damage
sustained by the State of Georgia as a result of PSA's violations of the State False
Medicaid Claims Act, O.C.G.A. § 49-4-168.1, an amount that will be proven at trial.

90. The State of Georgia is entitled to a civil penalty of between $5,500 and $ 11,000 as
required by O.C.G.A. § 49-4-168.1 for each of PSA's fraudulent claims.

91. Relator is also entitled to reasonable attorney's fees and costs, pursuant to O.C.G.A. § 49-
4-168.1(i)(2).

### COUNT III
### Violation of 31 U.S.C. § 3730- Retaliation

92. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth
herein.

93. PSA violated Relator's rights pursuant to U.S.C. 31 § 3730(h) by retaliating against the
Relator for lawful acts done by Relator in furtherance of other efforts to stop one or more
violations alleged in this action.

94. As a result of PSA's actions, Relator has suffered damages in an amount to be shown at
trial.

### COUNT IV
### Violation of O.C.G.A. § 49-4-168.4-Retaliation

95. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth
herein.

Filed 03/30/11

96. PSA violated Relator's rights pursuant to O.C.G.A. § 49-4-168.4 by retaliating against the Relator for lawful acts done by Relator in furtherance of an action under this section, including investigating matters that could reasonably lead to the filing of such an action.

97. As a result of PSA's actions, Relator has suffered damages in an amount to be shown at trial.

## COUNT V.
## Intentional Infliction of Emotional Distress

98. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

99. On October 22, 2010 the Relator, was given the option to resign or be placed on a "Performance Improvement Plan" hereafter, "PIP".

100. Said "PIP" is punitive in nature.

101. PSA's stated reasons for placing the Relator on a "PIP" are untrue and/or entirely pretextual.

102. Relator avers that her complaints and reports of corporate wrongdoing were the material causes of her placement into a PIP, and defendant's actions of placing Plaintiff in said status was in retaliation for her complaints.

103. As a result of PSA's retaliatory treatment of Relator, she has suffered emotional distress and damage.

104. PSA's conduct toward Relator is part of an extensive pattern of wrongdoing premised solely on PSA's quest for profits, carried out in wanton and outrageous disregard for the law, and the rights and welfare of the pediatric patients and the Relator.

Filed 03/30/11

## COUNT VI
## Litigation Expenses Pursuant to O.C.G.A. § 13-6-11

105. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

106. PSA has acted in bad faith, has been stubbornly litigious, and has caused the plaintiff unnecessary trouble and expense.

107. Accordingly, the Court should award Plaintiff the expenses of litigation, including attorney's fees and costs, pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator Yvette Odumosu prays for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims or overpayments that PSA knowingly and improperly concealed so as to avoid its obligation to pay money to the Government;

(b) awarding the United States a civil penalty of $11,000 for each of the false claims;

(c) awarding the State of Georgia treble damages sustained by it for each of the false claims or overpayments that PSA knowingly and improperly concealed so as to avoid its obligation to pay money to the Government;

Filed 03/30/11

(d) awarding the State of Georgia a civil penalty of $11,000 for each of the false claims;

(e) awarding Relator 30% of the proceeds of this action and any alternative remedy or the settlement of any such claim;

(f) awarding Relator special damages resulting from the retaliation;

(g) awarding Relator her litigation costs and reasonable attorney's fees; and

(h) granting such other relief as the Court may deem just and proper.


Respectfully submitted,


_____
MICHIKA REYNOLDS-QUILLIN
Georgia Bar No. 601934


LAW OFFICES OF MICHIKA REYNOLDS-QUILLIN
1800 Wilson Way, Suite 11
Smyrna, GA 30082
Ph: (630) 710-8025
Fax: (770) 436-9867
mq_qis@bellsouth.net


Filed 03/30/11

# VERIFICATION

Yvette Odumosu, hereby states that she is the Plaintiff/Relator in the instant action and that the facts contained herein are true and correct as to best of her knowledge, information and belief. This statement made subject to the penalties of 18 U.S.C. § 1621 regarding unsworn falsification to the authorities.

_____       3-30-11_____

Yvette Odumosu                                 Date